# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-2062V
UNPUBLISHED

| | |
|---|---|
| MICHELE TRALA,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: January 6, 2026 |

*David J. Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Jamica M. Littles*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On October 25, 2021, Michele Trala filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), as defined in the Vaccine Injury Table, after receiving a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccine on October 30, 2020. Petition at 1 (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Although I have not formally designated this Decision for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to compensation, and I award damages in the amount of **$71,000.00**, **representing actual pain and suffering.**

I.   **Procedural History**

This case was activated from "pre-assignment review" on March 9, 2022. (ECF No. 10). The parties attempted settlement, but their efforts were unsuccessful, and on November 1, 2023, Petitioner filed a Motion for Ruling on the Record and Brief in Support of Damages ("Mot."). (ECF No. 23). On December 12, 2023, Respondent filed his Rule 4(c) Report and Response to Petitioner's motion ("Resp."). (ECF No. 24). Petitioner filed a supplemental brief ("Reply") on January 22, 2024. (ECF No. 27). This matter is now ripe for disposition.

II.   **Relevant Factual History**

On September 22, 2020, Petitioner saw a primary care physician's assistant ("PA"), Janet May, at Southgate Medical Group ("Southgate") for a routine checkup and to follow up on her chronic conditions. Ex. 3 at 31. Her review of systems was negative for any joint pain or myalgia. *Id.* On exam, both of her upper extremities were normal to inspection and palpation, and her strength was normal and symmetric. *Id.* at 33.

On October 30, 2020, Petitioner presented to an urgent care clinic for a burn to her right chest wall. Ex. 1 at 10. She reported that she was lifting a bag of hot food when it broke open, spilling the food onto her right breast. *Id.* On exam, Petitioner had redness and blistering of the skin at the burn site. *Id.* at 11. Her musculoskeletal review simply noted that she had normal gait and posture. *Id.* At that visit, Petitioner was given the subject Tdap vaccine, although the site of vaccination was not documented. *Id.*

Three days later (November 2, 2020), Petitioner returned to the urgent care clinic for a concern that the burn area was infected. Ex. 1 at 8. She denied any fever and had no other complaints and made no reference to the vaccinated shoulder. *Id.* A review of the musculoskeletal system reported only that Petitioner had a normal gait and posture. *Id.* Petitioner was diagnosed with a burn of the chest wall and prescribed Keflex for possible cellulitis. *Id.* at 8-9.

On November 4, 2020, Petitioner returned to the urgent care clinic. Ex. 1 at 5. The record from this visit indicates that "[Patient] now states that the burn is still not improving and that she is having a reaction to the tetanus shot." *Id.* She specifically complained of swelling, sharp pains, and decreased range of motion ("ROM") of the upper left arm

2

"surrounding the site of the tetanus shot." *Id.* She characterized the intensity of her pain as "moderate." *Id.*

On exam, Petitioner had redness and sloughing of the skin of the right chest wall, as well as a ten-by-fifteen-centimeter area of redness, warmth, and swelling of the left upper arm. Ex. 1 at 6. She had normal ROM of the left arm, but with pain. *Id.* She was diagnosed with cellulitis and prescribed the antibiotic Bactrim, along with another course of Keflex. *Id.* at 7.

On November 6, 2020, Petitioner was seen at the Erie County Medical Center ("ECMC") Burn Clinic for her chest wall burn. Ex. 5 at 4. She did not mention any shoulder pain, and there is no documentation of an exam of the left shoulder. *Id.* She was prescribed oxycodone and silver sulfadiazine ointment for her burn. *Id.* at 6. On November 10, 2020, she followed up with a nurse in the ECMC Burn Clinic. *Id.* at 3. Again, she did not complain of any shoulder pain, and the nurse did not document a shoulder exam. *Id.*

On December 10, 2020, Petitioner had a telehealth visit with PA May for left arm pain. Ex. 3 at 36. Petitioner reported that she developed pain at the site of the vaccine injection, and "the next day woke up with swelling and redness." *Id.* She complained of continuing upper-arm pain "since tetanus vaccine." *Id.* She reported that the swelling and redness had improved, but she still had sharp and stabbing pain when moving the shoulder and was unable to lift her arm over her head. *Id.* She denied any residual pain from her burns. *Id.* PA May was unable to examine Petitioner's left shoulder over video, but she documented that Petitioner had limited ROM of the left shoulder "above head due to pain." Ex. 3 at 37. She diagnosed pain of the left shoulder and advised Petitioner to take naproxen sodium. *Id.* She also referred Petitioner to an orthopedist. *Id.*

On December 22, 2020, Petitioner saw orthopedic nurse practitioner ("NP") John Hanavan at Southgate. Ex. 3 at 39. She reported that she had "ongoing left shoulder pain that began [October 31] after receiving a tetanus shot for third-degree burns right lateral chest." *Id.* She stated that the night of the vaccination she developed redness, induration, and swelling with increased left shoulder pain and painful, limited ROM. *Id.* She was unable to sleep on the left side and reported difficulty with rotational movements. *Id.*

On exam, Petitioner had painful, limited flexion and elevation to about ninety degrees, with end-range pain. Ex. 3 at 40. She had crepitus with passive motion, but her external rotation was nearly normal. *Id.* She had good strength with resisted motion testing, which was characterized as "relatively pain-free." *Id.* She had significant tenderness of the lateral shoulder and acromial area, but no such tenderness of the sternoclavicular or acromioclavicular joints. *Id.* An x-ray of the left shoulder showed a well-preserved glenohumeral joint, minimal sclerotic changes in the greater tuberosity, and a

tiny calcification adjacent to the glenoid. *Id.* at 41; Ex. 4 at 58. NP Hanavan assessed Petitioner with impingement syndrome of the left shoulder, noting that her "[s]ymptoms began [the] same night that she received a tetanus injection [in the] left arm." Ex. 3 at 41. He administered a steroid injection, after which Petitioner reported improved ROM. *Id.* He referred her to physical therapy ("PT") and prescribed Tramadol for breakthrough pain. *Id.*

On January 6, 2021, Petitioner underwent an initial PT evaluation. Ex. 7 at 4. She reported that she had received a tetanus shot after getting burned, and that later that night she started feeling pain in her shoulder, that the pain kept her up at night and was worse in the morning, and that her range of motion was limited, especially with lifting, dressing, and washing her hair. *Id.* She rated on pain at that time as 8/10. *Id.* (Overall, Petitioner participated in 23 PT sessions between January 6 and June 1, 2021. *Id.* at 50. By the end of this timeframe, she reported only slight pain when lifting her arm above her head and was discharged with a home exercise program. *Id.*)

On January 26, 2021, Petitioner returned to NP Hanavan. Ex. 3 at 42. She reported some improvement after the steroid injection. *Id.* She was undergoing PT and had recently experienced improvement with a "bumped up" PT program.2 *Id.* On exam, she had "marked improvement" in ROM, with forward flexion to 170 degrees with end range pain. *Id.* at 43. She had normal strength but had positive Hawkins, "thumbs down," and Kennedy tests. *Id.* NP Hanavan's assessment remained impingement of the left shoulder. *Id.* He administered a second steroid injection, with good pain relief. *Id.* The plan was to proceed with an MRI if petitioner failed to improve over the next several weeks.

On March 26, 2021, Petitioner saw primary care physician Richard Karaga, D.O., at Southgate for follow up of her chronic medical issues. Ex. 3 at 45. A ROS was positive for a several-month history of right knee problems that were worse with walking and positional changes. *Id.* Petitioner did not report any shoulder pain, and no exam of the left shoulder was recorded. *Id.* at 46.

On June 30, 2021, eight months after the subject vaccination, Petitioner returned to PA Hanavan and reported that she felt 98% better, with only occasional discomfort with reaching overhead or rotating her arm. Ex. 3 at 49. She characterized her symptoms as "[n]othing sustained and nothing [that gave] her any significant disability." *Id.* She reported that she had completed her formal PT. *Id.* On exam, she had bilateral, symmetric ROM, strength, and stability, with some end range pain on the left side. *Id.* at 50. Impingement testing was negative, and she had no tenderness to palpation. *Id.* No further treatment was prescribed, and Petitioner was directed to follow up on an as-needed basis. *Id.*

4

### III. Factual Findings and Ruling on Entitlement

#### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

### B. Factual Finding Regarding QAI Criteria for Table SIRVA

The only SIRVA element that Respondent contests is the second criterion - whether the onset of Petitioner's pain occurred within 48 hours of vaccination. Response at 6; *see* 42 C.F.R. § 100.3(c)(10)(ii); *see also* 42 C.F.R. § 100.3(a)(XIV)(B) (requiring the first symptom or manifestation of onset within 48 hours of vaccination for a SIRVA injury following receipt of a flu vaccine). Respondent argues that Petitioner failed to report her shoulder symptoms when she was seen at urgent care three days post-vaccination for possible infection of her burn site, although when she returned two days later she reported symptoms. Response at 7. Respondent argues this is "strong evidence that she was not experiencing any shoulder symptoms on November 2" and that when she did initially

report symptoms on November 4, she "did not specify that her shoulder symptoms started immediately after the vaccination." *Id.* at 8. Respondent also points to the record which states that Petitioner "now states that the burn is still not improving and that she is having a reaction to the tetanus shot", contending that this present-tense wording indicates that Petitioner's reported shoulder symptoms were new since November 2 placing onset outside the 48-hour window. *Id.*

On review, I find that the record contains adequate evidence in favor of Petitioner on this issue. Notwithstanding Petitioner's two initial urgent care visits, Petitioner has consistently described to her treating physicians that the onset of her symptoms began within 48-hours of her vaccination. On December 10, 2020, Petitioner indicated that she developed pain at the injection site and "the next day woke up with swelling and redness," and again on December 22, 2020, she reported that shoulder symptoms, including pain, began the night of her vaccination. Ex. 3 at 26, 29.

Respondent asks that the greater weight be placed on the earlier urgent care visits than on these other visits which took place approximately six and eight weeks following vaccination, respectively. But it is not necessarily unreasonable for Petitioner not to have mentioned left shoulder symptoms during this urgent care visit, because the primary concern she had was for potential infection of a burn she had suffered only three days earlier. I also note that Petitioner has indicated in her sworn affidavit that she *did* mention pain in her left shoulder, but that she was told this was a normal reaction to vaccination. Ex. 2. Additionally, only two days later, Petitioner reported pain in her left shoulder "surrounding the site of the tetanus shot." Ex. 1 at 5. Although this record is silent as to the specific timing of onset, it certainly does not cut against the subsequent records which clearly and consistently place onset as within 48-hours of vaccination. I therefore find that the evidence preponderates in favor of Petitioner on the issue of onset.

Otherwise, the record contains sufficient evidence showing Petitioner has satisfied the other QAI criteria. *See* 42 C.F.R. § 100.3(c)(10)(i) & (iii)-(iv). A thorough review of the record in this case does not reveal either a prior or current condition, pain and limited range of motion ("ROM") other than in Petitioner's injured left shoulder, and no other condition or abnormality which would explain Petitioner's symptoms. Petitioner's medical records consistently reflect her reporting immediate shoulder pain post-vaccination. Thus, all elements of a Table SIRVA claim have been preponderantly established.

### C. Other Requirements for Entitlement

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of her injury,

7

and the lack of other award or settlement. Section 11(c)(A), (B), and (D). In this case, Respondent has not offered any argument to suggest that Petitioner has failed to meet these other requirements, and my review of the record confirms that Petitioner has preponderantly established that Petitioner suffered the residual effects of her SIRVA for more than six months and that there has been no other award or settlement. Accordingly, Petitioner is entitled to compensation for her SIRVA.

### IV. Compensation to be Awarded

#### A. Parties' Arguments

Petitioner seeks $78,000.00 in pain and suffering damages as compensation for her injury.[4] In support of this amount, Petitioner cites to *Hartman, Miller,* and *Bergstrom*.[5] Petitioner has also cited favorably to *Callejas, Belka, Celuch,* and *Cavalier* (albeit supporting the lower sum of $68,000.00).[6] Respondent argues that Petitioner should be awarded only $60,000.00 for her pain and suffering. Response at 10. Respondent notes that Petitioner's injury was relatively mild, and that the facts of this matter compare closest to *Berberich v. Sec'y of Health & Hum. Servs.*, No. 20-10V, 2021 WL 4823551 (Fed. Cl. Spec. Mstr. Sept. 14, 2021).

#### A. Legal Standards for Pain and Suffering Awards

In another decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections II and III of *Friberg v. Sec'y of Health & Hum. Servs.*, No. 19-1727V, 2022 WL 3152827 (Fed. Cl. Spec. Mstr. July 6, 2022).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related

---

[4] In her motion, Petitioner initially requested $68,000.00 for pain and suffering. Mot. at 23. However, between filing this motion and her reply brief, Petitioner obtained and filed the medical records pertaining to her 23 PT sessions. Petitioner argues that these updated records reflect a more serious injury with more treatment than what the original record indicated and therefore is worth a greater sum. Reply at 4.

[5] *Hartman v. Sec'y of Health & Hum. Servs.*, No. 19-1106V, 2022 WL 444456 (Fed. Cl. Spec. Mstr. Jan. 14, 2022); *Miller v. Sec'y of Health & Hum. Servs.*, No. 20-959V, 2023 WL 4312920 (Fed. Cl. Spec. Mstr. Jun. 1, 2023); *Bergstrom v. Sec'y of Health & Hum. Servs.*, No. 19-784V, 2021 WL 5754968 (Fed. Cl. Spec. Mstr. Nov. 2, 2021).

[6] *Callejas v. Sec'y of Health & Hum. Servs.*, No. 20-1767V, 2023 WL 12073989 (Fed. Cl. Spec. Mstr. May 5, 2023); *Belka v. Sec'y of Health & Hum. Servs.*, No. 20-585V, 2022 WL 4717891 (Fed. Cl. Spec. Mstr. Sept. 1, 2022); *Celuch v. Sec'y of Health & Hum. Servs.*, No. 18-544V, 2021 WL 2368137 (Fed. Cl. Spec. Mstr. May 10, 2021); *Cavalier v. Sec'y of Health & Hum. Servs.*, No. 21-389V, 2023 WL 5500404 (Fed. Cl. Spec. Mstr. Jul. 25, 2023).

injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[7]

### B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, signed affidavits, filings, and all assertions made by the parties in written documents. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Based upon the record as it currently stands and consideration of relevant comparable cases, **I find that $71,000.00 represents a fair and appropriate amount of compensation for Petitioner's pain and suffering.**

In making this determination, I have considered the mild-to-moderate nature of Petitioner's left shoulder pain and limited ROM, as well has her quick recovery and good prognosis. Petitioner reported her pain promptly after vaccination, although the complaint was secondary to her more immediate concern of a potential infection of a burn wound she had sustained five days earlier. Petitioner's first instant of seeking treatment specifically for her left shoulder was on December 10, 2020, 41 days following vaccination. Although Petitioner did report moments of severe pain (e.g., 8/10 at the beginning of PT), the overall nature of her injury appears to have been more moderate than the most extreme moment of pain (e.g., during an examination on December 22, 2020, Petitioner tested her strength with resisted motion testing, which was characterized as "relatively pain-free.") Ex. 3 at 40. She also consistently reported good results from her two cortisone injections and her pain made a steady taper downward while engaged in PT and home exercise. On her final PT examination on June 1, 2021, she only reported

---

[7] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

slight pain when reaching overhead and no pain with rest. This was confirmed when she reported to PA Hanavan on June 30, 2021, that she felt 98% better and only occasional discomfort with reaching overhead or rotating her arm. Ex. 3 at 49.

The overall severity of the SIRVA in the instant case was not high enough to warrant $78,000.00 in damages, as Petitioner has requested. However, Petitioner has cited to several useful comparable cases, and upon review I find the instant case to be most similar to *Celuch* and *Hartman*. The *Celuch* petitioner underwent 24 sessions of PT, one cortisone injection, two MRIs, and was largely recovered approximately eight months after the inciting vaccination. 2021 WL 2368137, at *4. She reported pain of 5/10 at her initial medical evaluation, which increased to 7/10 at her initial PT evaluation. *Id.* Like Ms. Trala, she experienced good results from a similar number of PT sessions, although that other petitioner did require another cortisone injection following discharge from PT. *Id.* The *Celuch* petitioner was awarded $70,000.00 for her pain and suffering.

Similarly, the *Hartman* petitioner sought treatment for her shoulder pain quickly after vaccination (28 days), underwent 21 PT sessions, and was largely recovered in approximately five months. 2022 WL 444456, at *4-5. Although Petitioner in the instant case underwent two cortisone injections whereas that other individual refused offers for such injections, the *Hartman* petitioner also underwent an MRI which revealed a torn tendon and her treating doctors at least broached the subject of a possible surgery, whereas Ms. Trala has not undergone an MRI and never considered surgery on her shoulder. The *Hartman* petitioner's lingering symptoms also have been described as worse than Ms. Trala's, and that individual described a more significant impact on her personal life due to her SIRVA. *Id.* Ultimately, while the duration of the *Hartman* petitioner's formal treatment was less than the instant case, the underlying injury appears slightly more severe, and that individual was ultimately awarded $75,000.00 for her pain and suffering.

*Miller* and *Bergstrom*, each of which awarded $80,000.00 for pain and suffering, present notably more severe injuries than the instant case. For example, the *Miller* petitioner initially described pain of 7-10/10, and underwent 24 PT sessions and 2 cortisone injections over a period of approximately ten months. 2023 WL 4312920, at *5. However, that individual's symptoms continued in a mild form for an additional six months before she made a full recovery. *Id.* And the *Bergstrom* petitioner's course of injury was longer (albeit with several delays), with an initial delay of three months before seeking treatment, a gap of six months following a cortisone injection, returned pain which was treated with a second injection, and with pain rated at 5/10 at best and 10/10 at worst, indicating constant moderate-to-severe pain, worse than what Petitioner has described in the instant case. 2021 WL 5754968, at *7-8.

10

Respondent's cited case, *Berberich*, presents a less-severe injury than the instant case. Although that petitioner reported his injury quickly, he described pain of only 2/10 at that time and received a steroid injection. 2021 WL 4823551, at *3. Ultimately, the *Berberich* petitioner experienced peak pain of 5/10, and only underwent 2 PT sessions before he described his pain as 0/10 at rest and 3/10 intermittently with activity nine months post vaccination. *Id.* at 7. That claimant was ultimately awarded pain and suffering damages of $60,000.00, but the record reflects a more severe injury suffered by Ms. Trala, and therefore she should receive a larger amount.

## Conclusion

For all the reasons discussed above and based on consideration of the entire record, **I find that Petitioner's left shoulder injury meets the definition for a Table SIRVA. Thus, causation is presumed, and Petitioner is entitled to compensation in this case. Furthermore, I find that $71,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[8]

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $71,000.00, representing compensation for her actual pain and suffering, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u><br>
Brian H. Corcoran<br>
Chief Special Master

---

[8] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.